176205 Kutite LLC et al. versus Excell Petroleum LLC et al. Oral argument, 15 minutes per side. Mr. Gibson for the plaintiff's appellant. Your Honor, may it please the court, Ralph Gibson for the plaintiffs. I've reserved There were four dispositive motions filed over a number of years. And the first, well there was a motion to dismiss, but then there were three subsequent motions for summary judgment. The first two were denied that the defense filed. The plaintiff also filed a motion for partial summary judgment when the defendants filed their second motion for summary judgment. And the reason that the trial court denied the two motions the first time was that it found that the facts of the case showed detrimental reliance, leading it to a promissory estoppel finding. And of course, promissory estoppel, equitable estoppel, and judicial estoppel all apply here. But we don't even have to get to estoppel because there was a contract that was formed. The contract was this. Mr. Kutight So, I'm getting a little confused. Are you addressing the contract claim now or the The contract claim, Your Honor. Well, only. I don't think you need to reach the estoppel claim unless there's some reason for alternative. Because the contract, there was an assignment of agreements. It was drafted by the defendants, in-house lawyers. It was sent by the defendants paralegal to Mr. Kutight. Mr. Kutight signed it verbatim for himself and his LLC called Kutight LLC. And the assigners, there are two individual assigners that signed it along with their LLC. And so, there were five parties to the assignment on the assigner side, which were the three assigners, their company, and the two individuals. Mr. Kutight and his LLC, they got it notarized, had a closing, and sent it back. So, it was drafted by that and there were no changes. But didn't it say that it wasn't valid until signed? No. It did not say that. That's their argument, but it's not. But there was a place indicating their signature and also there was an email suggesting that approval, final approval wouldn't be given until this ATM contract was complied with by your client. Exactly. So, how was there a meeting of the minds? I understand that your client wanted to enter into this agreement and the other party wanted to enter into, it seems like, a lot of the agreement, but then there was this one piece, the ATM. And without that one piece, how do you have a meeting of the minds on the whole thing? Right. Okay. The timing is very important. Yes, there was that email. The problem was that email was on October 2, 2012 at 4.01 p.m. At that point, the contract had gone through. So, the ATM agreement is not anywhere in any agreement. There were five documents sent to my client by in-house lawyers. There were the assignment of agreements, an amendment to the memorandum of agreement, which related to the supply contract, and then the three agreements that were attached to it. The lease, the first amendment to the lease, these were already signed agreements that were being signed, and then the supply contract, five. There wasn't a sixth. There was not an exclusive ATM agreement. There's nothing mentioned in any single contract, any one of these five agreements, any email, anywhere. That's been admitted to by Mr. Smith. He's sitting right back there, their in-house lawyer. He admitted in his 30B-6, there is no writing about an ATM agreement until that email at 4.01 p.m., October 2, 2012. At that point, there's already a binding agreement. And your theory is that there's a binding agreement because they mailed, they drafted some documents, they mailed the five documents to your client, your client signed them and returned them, but they had not yet signed them. Well, actually they did, but that's another problem. Mr. Moon, who was the signatory for the defendants, had actually signed the documents. They just never sent them back to my client. There's an email from the same paralegal, Ms. Falbush, that indeed the documents had been with my client, wondering where's my signed assignment. Sir, you're kind of mumbling. I'm sorry. When my client inquired as to where his signed assignment was, we could start showing it to banks and other people he needed to show it to, to run his business. The paralegal, Ms. Falbush, said they've been signed, but we're awaiting, I don't know, I don't know what she was waiting on, but I think at that point she had been told not to send it back to my client. There's an internal email, actually, between Ms. Falbush and an in-house lawyer that we received in Discovery that said Scott Moon has signed the agreements when the lawyer is asking what's going on with them, and she's just saying that they've been signed. But even under that theory, as you've just articulated, if we assume that all of that is true, isn't that problematic? When you talk about having a meeting of the minds and an executable contract, you said they signed it, but they didn't communicate, get it back to the other side, there were some issues. That means there's some kind of a reservation or some kind of hesitancy, and you have not, under the random contract theories, it seems to me, completed the loop. There was no reservation. There's nothing in any document sent to me. Well, okay, strike reservation and say hesitation. They hadn't gotten it back. The hesitation doesn't come until, if you and I, let's say you're private practice, we agree on a settlement, you send me a settlement document, I sign it and my client signs it and I send it back to you, you're bound at that point. Okay, but I thought you said that they didn't send it back. They did. My client sent it back, oh yeah, it's acknowledged. I don't know, I mean, okay, why don't you carry on, because some of the documents didn't mesh up. Here is the document, my client, it's pure offer and acceptance. I mean, I saw somewhere where 83% of contracts were oral, so the fact that you don't have a writing is not even actually required. In this case, you have a writing, I'm just asking the court to impute a signature, which the Wastus case, the H-U-E-S-T-I-S, which was discussed also in Judge Folk's opinion, he just decided it was not applicable, but it's 237 Southwest 3rd 666. In that case, the court imputed a signature. Well, okay, I think you just said what you were really going at, is that you're viewing the documents being sent to you, and they're told these are the five documents you have to execute. Well, three of them are attached, the other two had to be executed. Three what? Well, there are five documents sent, there were three, there was the lease, the First Amendment to the lease, and the supply contract, which were already signed, they were just being assigned, they were attached to the two assignments. I see, okay, but you're saying that that was an offer? Yes. And that you accepted and sent it back, and... Yes, and you have a binding contract with them. Okay. It's pure binding contract. There was nothing that said that, I don't know why I have this recollection that there was... That's because they keep saying it, but there's no... So you're saying nothing said that this is effective upon our signing it. Exactly. No, there's nothing saying either way, they sent it to them and they sent it to us, anything else we want. I'm not asking that, is there anything that said that this document becomes effective when we, not you, your parties, but when we, Excel, the landowner, signs it? There's nothing either way, it's just once they sent it... Okay, so there's nothing that said that. Right, it's back to what I just said with Judge Donald. If she and I were in private practice, both in private practice, and once I signed the settlement agreement and sent it back to her, my client... I understand that. But she can't add another... That's a different... ...provision two days later, she can't do that. So there's this email from, on September 27th, I believe, this is from Judy Flawbush. The email that transmits these documents says that after your client signs the document, once Scott Moon signs, we will send you and the assigner a copy of the assignment of agreement. So in other words, we're sending this to you, it's blank as to the other party's signatures, we're going to send it to you, you send it back, we'll get what you've given us, maybe you made changes, you could have made changes to the document, right? So we'll get it back, we'll review it, then once we've approved it, we'll sign it and send it back to you, then we would have a contract. Right, and Scott Moon actually did sign it. But aside from that, the problem here is, and then you go into, they started, my client sent four more than $9,000 rent payments to them that they accepted from October, November, December... Now you're kind of in the estoppel. No, it's also part of the assent to the contract. Waste just talks about that. You look at the other elements of assent. You're saying that they performed. Right. They acted like... Like it was a contract. Right. So there's something about this case that I find very confusing. I don't understand how you had an evidentiary hearing. Well, I don't understand that one either, Your Honor, I can't... But did you ever object to that? Did you ever say, Judge, you're finding facts now? He said, he canceled the trial date and said, we're going to have a hearing about the summary judgment motion on that date. And then he wanted to hear proof. My client was there and some other folks. And so it was like a summary judgment evidentiary trial. It's my first one in 27 years. Her question was not what he said, but what did you say? Did you object? This won't be summary judgment then. It'll be like a trial. You'll be making findings of facts. It'll be harder for my client not to appeal. Well, he didn't... He told us it was a summary judgment motion hearing and that's how he ruled. I didn't hear you. He told us it was a summary judgment motion hearing and that's how he ruled. So we do have to look at it in the light most favorable to the plaintiff. But of course, I'm also saying that plaintiff's entitled to a summary judgment because there really aren't any facts in dispute. The only problem is they help the plaintiff. Oh, so you agree that there's no... No, I agree that their facts in dispute is to their motion, but not mine. Okay, you have your rebuttal. Okay, thank you. Good morning, Your Honor. Lance Miner of the Memphis Bar. I'm here for the defendant parties, which are the owner of the convenience store property, the petroleum supply company, and the managing company that manages the properties. And we believe... I mean, this is a commercial landlord and tenant matter, as you know. It's a matter involving parties who, on the one hand, are in the business of running convenience store gasoline stations, and a plaintiff who had put himself in a position where he said, I am eminently qualified to get into the convenience store business and I want to obtain an assignment and an assumption of these agreements that are already in place between a previous tenant and my parties. That's where, thereafter, some confusion ensued. But the documents that were... And I might point out, as we pointed out in our brief, the documents that are the governing documents, really only three, primarily the triple net lease, the fuel supply agreement, and the exclusive ATM agreement. All of those agreements were in place with the previous tenant. Okay, I'm very confused about this because I thought that the ATM agreement was between the previous tenant and a third party, and that it had nothing to do with you, except that you had some relationship with the third party, and they said, would you do this for us? And you said yes. No, actually, Your Honor, if that was unclear, I apologize for that being not clear in our brief. But that agreement is between my clients and a third party provider who provides ATMs for this site and a number of other sites. And that's a 10-year agreement. And that agreement was acknowledged by the previous tenant as being in place and governing the fact that this one and only ATM on this site was to be the ATM that my clients contracted to be there and who the previous tenants acknowledged and agreed would remain there and no other ATM machine would be brought on site. So the written agreement is between your clients and Tennessee Management? That's correct. Tennessee Management is who we contracted with to place the ATM on this site as well as a number of other sites, similar sites, unrelated. Okay. And did your agent, I wish I was better with these names, did your agent who was on the site tell the plaintiff that, well, isn't there some testimony that he told the plaintiff that you can put whatever ATM you want here? Well, there was some testimony about that. And we believe, of course, that was erroneous because the, and I don't know the context of that testimony, but there was some confusing testimony about that. There was also testimony by the plaintiff that he acknowledged, you know, I really never had an agreement with the majors' parties when he's now saying to the court, oh, I had this agreement with the majors' parties. So this is why you have trials. Correct. So I really think you need to look at the facts in the light most favorable to the plaintiff because that's, this was a summary judgment motion, wasn't it? Correct, correct. Actually, cross-summary judgment, a motion for partial summary judgment by Mr. Gibson. But you're defending the grant of summary judgment against the other party. So you have to look at the case in the light most favorable to the plaintiff. We believe the lower court did so in viewing all of these facts in the light most favorable to the plaintiff, the non-moving party, and in fact, went overboard to, for whatever reason, judge Foulkes elected to hear proof and heard two days of proof on certain factual matters that he wanted to satisfy himself in hearing and ruling on these cross motions for summary judgment. Was there a provision that said these documents are only effective upon our signature? Absolutely. The triple net lease as well as the supply agreement, both had that provision in there. And I believe the agreement that the document that was signed by Mr. Kutyte with the previous tenant whereby he was attempting to obtain an assignment and an assumption of these agreements to put himself in as operator, that agreement acknowledged that all of this was subject to the written, the consent of the major's parties, our client, which was never achieved and was never given for good reason. Wasn't there testimony that when all of this started, the first thing they had to do, or really they didn't do anything until they, I'm looking for his name, Hewitt or something? Hewitt is one of the principals. Okay. They didn't do anything until they got in touch with his son, who was their representative, who asked and who said, well, you need to do this, that and that and get me all of this information, which they did. And then he said that they were approved. So then they went to the next step, right? Yes, that's correct. That was the due diligence period. And all of that was subject to ultimately the documents being signed and approved by my clients in order to make it the prior written consent.  And they knew they were prepared to do that. And they go ahead with the deal and reliance on the fact that they've been approved, they see the documents, they like the documents, they're going to sign them and they proceed with the deal. And then after all of that is done, you say, oh, there's one more document, right? Not exactly. It was discussed, well, to put it in context, Mr. Kutait went in, spent three weeks in the site to satisfy himself and meet with the Azzell Investments people with previous tenant. I know these names are a bit confusing, but Azzell Investments previous tenant was the current occupant and operator of the site. Mr. Kutait went in, spent three full weeks familiarizing himself with the operations, reviewing all the salient documents, particularly reviewing all the government documents, the governing documents. And of course, one of the major items of revenue there, one of the significant items of revenue is the ATM machine, which of course is there in full view, heavily utilized. And he was aware of that. He no doubt was aware that there was an ATM agreement with a third party that Azzell had signed an acknowledgment to abide by. Also as, I'm sorry, go ahead. Did he have access to that particular document? So your argument is the current tenant, Azzell, they had this agreement with you. Correct. You have an agreement with the ATM provider. Correct. When Azzell goes to assign his interest to Mr. Kutait, your argument is the ATM agreement was part of what he was assigning. It was part of the entire package. Part of the entire package. Always was. But did Mr. Kutait, when he was there, other than seeing that there's the physical presence of an ATM machine in the store, did he have access to a document that would have told him, oh, there's an exclusive agreement here? There was a document, an acknowledgment document in place that if he were going, if I were the one going to someone to assume, to take an assignment of their interest in the leasehold and to assume their obligation, step in their shoes, I would want copies of all those documents. I have no reason to believe he didn't get copies of all of those, including the ATM one. Was the document included in the five documents that you told him he had to sign for this deal? Don't know if it was included in the original discussions about that, but it certainly was, he was reminded of that before it came time to procure the defendants. I'm sorry, who testified to that? I'm not sure who testified. And he testified to the contrary. And he also testified that, I think the name is George Hines, I don't know, that the representative told him he could have whatever machine he wanted. These are questions of fact. Your Honor, the court heard extensive proof on all of these issues. And of course, the lower court concluded that there was no meeting of the minds, there was no contract either written or implied. How does the court do that on a motion for summary judgment? Where does that come from? I'm not sure how Judge Folks came to that conclusion. I can't speak to that, but he chose to do that. Should we treat this as a motion for summary judgment, given that the judge effectively held a trial? I mean, is this a motion for summary judgment? I don't know what kind of animal is before us. I understand it's styled a motion for summary judgment, but is it? It was disposed, well, I've been practicing law 41 years, and this is a bit of a new one on me as well. But it was a summary judgments were pending, had been pending for some time. The court had set a trial date. We appeared at the trial date or a day or two before, and the court said, here's what I wish to do. And so, of course, we abided by the court's wishes. There was no objection from the plaintiff. And we had two days, two or three days of proof. But what he granted was summary judgment. He granted, his order was in the nature of a grant of summary judgment in our favor, a denial of partial summary judgment. I mean, I don't know, I hadn't thought about this before, but are we bound by his saying, I call this summary judgment rather than verdict for the defendant? I mean, what is the difference between what he did and a trial? Well, there were many differences. For instance, there was no proof. The plaintiff wasn't allowed to put on any proof as to damages, which we believe are highly inflated because he didn't make any money during the four months he was allowed to stay in the premises while all this back and forth was going on. And of course, we would like to put on, obviously, if the case were remanded, we would obviously want to put on proof to refute his proof on damages because there is crazy amounts that he's seeking. But we believe that the court, albeit in an unusual way, made a proper disposition of this case. Do I know why Judge Folks chose to do it this way? I do not. But I certainly respect the court and believe that he made a proper decision. And I believe he made the proper factual finding based upon hearing proof from all parties, some of which was a bit confusing and conflicting, but the court sorted through that and made what I believe is a sound ruling as to the fact that prior written consent was required in the documents. Prior written consent was never given by my clients, albeit whether documents were signed and held pending certain things, including the acknowledgement of the ATM relationship and signing off on that or whatever, but it was never given. And of course, during that time, the plaintiff, in the nature of unclean hands, had bounced checks on fuel deliveries, had failed to pay rental payments. The court found it was a month-to-month rental. Why were you delivering? Why were you treating them like the tenant? I mean, we believe that they were in the process of becoming a valid assignee of the documents and the position that Azelle Investments had previously been in. However, they never fully complied with all the conditions and requirements to do so. But my clients were very patient and agreed to let them continue in the premises on the basis that, you know, we'll deliver you. I mean, there was no reason to have the site go dark during this interim period, and so we agreed to basically, during this transition, allow them to stay in the premises and operate it. But they never complied with the requirements. I think your representative testified. I'm not sure who it was. But pertaining to that ATM agreement, my understanding is that the person testified, well, we got a phone call from TM, and we had a long relationship, and they asked us to get them to sign onto it, so we did it. Which sounds very different from somebody saying, oh, we had a 10-year commitment that we had to keep, and so we needed to get him to sign. I don't have any specific recollection of anyone saying that, but the fact of the matter is it was a 10-year term. The ATM agreement itself. I know there was a 10-year term. I was under the impression that the contract was between the Asinore Council. That's so distracting. Will you please stop? I'm sorry. The relationship was between the Asinore and the plaintiffs, but you're saying the contract was between your clients and TM. Well, the plaintiff was attempting to step into the shoes of the Asinore, which is Azzell Investments, the previous tenant, or at that time, the existing tenant, the tenant. Mr. Kutight was attempting to take an assignment from Azzell Investments to step into their shoes and begin taking over the operation of the convenience store service station. However, the agreement as to the ATM was acknowledged by Azzell Investments. They acknowledged the fact that the owner of the property and the landlord had an agreement with Tennessee Management as to this particular ATM and that it was an exclusive ATM agreement for this store. Would you please somehow let us ... Do you know the PID of the agreement between TM and your client? Do you know the page ID? I don't, Your Honor, but I could certainly try to find that and inform the court of that, and I believe I'm out of time. Okay. Thank you. Thank you. Thank you. Oh, excuse me. Do you have any questions? No. Do you have any questions? Okay. Thank you. Your Honor, I've taken care of it. There was no agreement between Tennessee Management and the defendants, and Mr. Smith, sitting right back there, in his deposition, Rule 30b-6 deposition, I ask him this question. It's document 59-5, page ID 15-53. It's his deposition attached to the motion for summary judgment. My question, by you, I mean any of the three defendants. They have no agreement at all with Tennessee Management regarding compensation for these ATMs that are ... He breaks me off, and his answer is, Tennessee Management has not paid one cent, and there is no agreement with respect to ATMs. Then my next question is, well, why didn't you let Tennessee Management just fend for itself? I mean, isn't it between the assignors and Tennessee Management? For the next couple of pages, we go back and forth. Basically, he just said, oh, well, they had an agreement, so we wanted to make sure it was enforced. The reason is Tennessee Management has a history with the defendants. They own about 20 of their 40 stores in the Memphis area, and that's what that was all about. What had really happened is the paralegal, the in-house lawyers, all that had not sent over an ATM agreement, and my client didn't know anything about it because Tennessee Management was fending for itself. There was an ATM agreement between the assignors and Tennessee Management, so that's what that was about. And both, Mr., you were referring to earlier, it's the field rep, Carl House, page 17 of his deposition. I've got the actual number here. It's record entry 59-4, page ID 1474. Carl House, who's the defendant's regional field agent for this area, the defendant's regional field agent, he testified that he told Mr. Kutight before he took the store that he could use any ATM he wanted. And it was Mr. Kutight's testimony along with one of the assignors that Mr. Kutight thought that they were going to take this ATM, the assignors, to one of their other stores. They had four stores, and he thought they were going to actually take the ATM to one of their other three stores. That was his testimony. So that's what this is all about. Nobody ever told Mr. Kutight he was going to be responsible for this ATM. And in fact, the assignor testified that when he first took over the store, he thought it was going to be paying a lot more, and they only got $500 per month. These are narrow margin businesses, and they can make up to $3,000 to $4,000 a month on the ATM, which is why Mr. Kutight went with another ATM vendor, thinking he had the absolute right to do that. Now, at 4.01 p.m. on October 2nd, it was too late. I can't agree with you on a contract today, and five days later, I say, oh, we need to add one more thing to it. Can't do it. And there's no consideration for this at all. There's nothing mentioned in any document anywhere, any email anywhere. And all of the undisputed testimony was that Mr. Kutight was not told anything about an obligation with respect to the ATM. Um, are you saying that there's nothing in any of these documents that say that they require the approval of the premises owner? Well, he had the approval of the premises owner, which is why they sent the assignment to him. He was approved by Mr. Hewitt in the summertime, in August of 2012. They then agreed to the assignment, and Mr. Kutight had to pay certain money for the gasoline that was in there. It was like $55,000, and then 30-some-odd thousand for the inventory, and $50,000 for goodwill. The whole amount was $139,000 that he paid in cash. And to do that, the only thing that was in the, it was called a bill of sale agreement, bill of sale between the Assignors and Mr. Kutight, was that they get a valid assignment from the Assignees. The Assignors, which are the defendants. They approved him. They drafted the agreement, sent it to him. He signed it. The Assignors signed it. They sent it back. At that point, we have a binding agreement. It's pure contract one. So you're saying the approval came when the son approved them, and then the defendants sent all the documents. That's all undisputed. And then that was the proposal, and your client signed it. The deal was done. A few days later, they come back and go, we want you to sign this too. It's actually five days. Well, the effective date was October 1, but the date, I say, of the binding agreement was September the 27th. Okay. And October 2nd, 4.01 p.m., even though it was still just five or six days later, it's still too late. We have a binding agreement. If you offer me $5,000 to buy your car, and I say yes, we have a binding agreement. You can't come back and add another contingency to it five days later. That's pure law school. It's that easy. Thank you. Your time is up. Thank you. Counsel, sometimes when we're preparing for argument, it strikes us, or one of us, or all of us, that a case sort of calls out for some intervention from the mediation office. And I have to say that, in my view at least, this is one of them. And so I believe that Mr. McFaul has been here during the argument, and I'm going to ask that you speak to him after, let him see whether a meeting or whatever would make sense, and we'll just take our best shot at it. In the meantime, we'll be proceeding. Thank you both for your arguments. Thank you.